*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* M. GREEN, Minor.

UNPUBLISHED
September 12, 2025
9:52 AM

No. 372646
Genesee Circuit Court
Family Division
LC No. 19-136367-NA

Before: K. F. KELLY, P.J., and MARIANI and ACKERMAN, JJ.

ACKERMAN, J. (*dissenting*).

This case concerns the termination of respondent's parental rights to her son, MG, after the child suffered a near-fatal fentanyl overdose while in her care. That tragic event followed respondent's long and painful history of addiction—one that had already led to the termination of her parental rights to another child and that continued to place MG at risk despite repeated opportunities for respondent to get treatment. Because the trial court's decision was supported by the record, I respectfully dissent.

## I. FACTUAL BACKGROUND

The record reflects respondent's longstanding struggle with addiction and the impact it has had on her children. Because those facts bear directly on the risk of harm to MG and the trial court's best-interests determination, a brief review of the background is warranted.

Respondent's struggles with substance abuse began before the birth of her first child, MB, in 2020. MB was born opiate-positive and treated for opiate withdrawal. The Department of Health and Human Services (DHHS) petitioned for protective services, and MB was placed with her maternal grandmother. Despite being offered a wide array of reunification services—including multiple options for substance abuse treatment, independent living and parent aide services, drug screens, a psychological evaluation, and individual counseling—respondent failed to benefit and continued using heroin. She voluntarily released her parental rights to MB in 2022, two months before MG was born.

-1-

Respondent admitted that she used heroin daily for six months of her pregnancy with MG. As a result, he was born opiate-positive, suffered withdrawal symptoms, and required several weeks in the neonatal intensive care unit. He was diagnosed with neonatal abstinence syndrome, which is caused by drug exposure in utero, along with poor feeding, small gestational age, and dysmorphic features. To ensure proper nutrition, he was placed on a feeding tube and prescribed a high-calorie formula. In subsequent appointments with pediatricians and specialists, respondent was counseled on the importance of using the feeding tube, but she resisted medical advice and preferred to feed MG orally. Although MG gained weight after discharge, he remained underweight for his age.

Child Protective Services (CPS) investigated complaints against respondent twice after MG's birth. The first complaint arose when he was born opiate-positive; it was substantiated, services were provided, and the file was later closed. A second report in May 2022 alleged that MG fell off a sofa while respondent was intoxicated. That complaint was not substantiated.

The incident underlying this petition occurred on January 26, 2024, when MG was approximately 18 months old. Respondent testified that while preparing to leave the house she saw MG put several items in his mouth, but she removed them. When she later went to put on his shoes, she noticed that he was lethargic and pale, and his lips were starting to turn blue. She called 911 and reported that he was choking. Paramedics transported MG to Hurley Medical Center, where he was revived only after two doses of Narcan. Doctors later determined that he had overdosed on fentanyl. They also observed that his feeding tube was filthy and that the bottle of milk respondent brought with her was rancid.

Law enforcement interviewed respondent, who initially denied any history of substance abuse and insisted there were no narcotics in the home. She then suggested that MG might have accessed prescription pain medication from her nightstand because he was "very clever." After being confronted with her narcotics-related criminal record, respondent admitted she had previously been addicted to heroin for four years but claimed she had been sober for the past 18 months. Officers obtained a search warrant for her home and discovered plastic bags with fentanyl residue on and under the nightstand in the bedroom she shared with MG. When confronted, she first denied knowledge of the drugs, then admitted she had used heroin the night before MG's overdose and remarked that MG "knows better than to touch things" on the nightstand. Respondent was arrested and charged with second-degree child abuse and possession of a controlled substance.

Following MG's hospitalization, DHHS petitioned to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (c)(*i*), (g), and (j). The trial court removed MG from respondent's care and placed him with his nonrespondent father. Despite court-ordered drug screens, respondent continued to test positive for fentanyl.

In her criminal case, respondent pleaded guilty to second-degree child abuse and, as part of her sentence, was directed to complete felony recovery court, among other things. She began the program in April 2024 but repeatedly tested positive for fentanyl. In June 2024, she was ordered to residential treatment, which she completed the following month. She then entered intensive outpatient treatment, moved into a sober living home, and was prescribed an opiate blocker. Between that point and the termination trial, her drug screens were negative.

The termination trial began on August 14, 2024. The court heard testimony from MG's physicians, CPS caseworkers, law enforcement officers, respondent, and others. Respondent admitted she had been addicted to heroin for four to five years but testified that she had been sober for 64 days. She minimized the severity of her addiction, denying that MG's medical problems stemmed from in utero drug exposure and dismissing his near-fatal overdose as merely "a mistake."

At the close of trial, the court found statutory grounds for termination and concluded that termination was in MG's best interests. This appeal followed.

## II. STATUTORY GROUNDS

The majority concludes that the trial court clearly erred by finding statutory grounds to terminate respondent's parental rights because it relied too heavily on her past conduct in assessing the risk of future harm. I respectfully disagree.

To be sure, I agree that termination was not properly supported under MCL 712A.19b(3)(c)(*i*), which by its terms cannot justify termination at the initial disposition. See *In re Walters*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369318); slip op at 5; MCR 3.977(E)(3)(b). I also agree that MCL 712A.19b(3)(g) was inapplicable, as the statute requires a finding regarding a parent's financial ability to provide proper care or custody, and the trial court made no such findings here. See *In re Ray*, unpublished per curiam opinion of the Court of Appeals, issued October 13, 2022 (Docket Nos. 360615 and 360616), p 13 (holding that reversal is required when a trial court fails to make explicit findings as to a respondent's financial ability unless the record otherwise demonstrates that the respondent could provide proper care or custody).[1]

But that does not end the inquiry. A single statutory ground is sufficient to support termination, *In re Martin*, 316 Mich App 73, 90; 896 NW2d 452 (2016), and in my view the record amply supports the trial court's reliance on at least MCL 712A.19b(3)(j).

Termination under MCL 712A.19b(3)(j) requires a forward-looking determination of whether there is a reasonable likelihood of harm if the child is returned to the parent. *In re Mason*, 486 Mich 142, 161; 782 NW2d 747 (2010). The majority faults the trial court for relying too heavily on respondent's history. But subsection (j) expressly requires consideration of the parent's "conduct or capacity," which necessarily encompasses past behavior. This Court has repeatedly recognized that a parent's history is relevant to whether future harm is likely. See *In re Moss*, 301 Mich App 76, 82; 836 NW2d 182 (2013) (affirming termination under MCL 712A.19b(3)(j) based on the respondent's history of substance abuse and failed treatment, even though she was receiving psychiatric assistance at the time of termination); *In re Olive/Metts*, 297 Mich App 35, 41; 823

---

[1] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017).

NW2d 144 (2012) (affirming termination under MCL 712A.19b(3)(j) where the respondent's longstanding and unresolved anger-management issues supported a finding of likely future harm).

That principle applies here. Respondent's struggle with sobriety has been cyclical, marked by repeated relapses following treatment. Those relapses underscore both the severity of her addiction and the risks it poses: her relapse following her 2022 treatment led to MG's near-fatal fentanyl overdose, and she relapsed after her first inpatient treatment in 2024 even though she knew her parental rights were at stake. Most recently, she completed inpatient treatment in July 2024 and then entered intensive outpatient care. But at the time of the termination trial in August 2024, she had been out of inpatient treatment for only a month and was still living in the structured environment of a sober-living facility. The record contained no evidence of her ability to maintain sobriety outside that setting.

And when respondent was actively using drugs, the risk of harm to MG was not hypothetical but immediate and severe. He overdosed on fentanyl left within his reach, requiring revival by Narcan. When he arrived at the hospital, staff noted that his feeding tube was filthy and that the milk respondent brought for him was rancid. When law enforcement later executed a search warrant at respondent's home, they found plastic bags with fentanyl residue within reach of the child and trash and debris strewn throughout the bedroom she shared with him.

Respondent's own testimony further reflected limited insight into the consequences of her addiction. She denied that MG's medical problems resulted from in utero drug exposure and referred to his overdose as merely "a mistake." That testimony, coupled with her history of relapse and the conditions observed at the time of the overdose, provided a firm basis for the trial court's finding that MG would face a reasonable likelihood of harm if returned to her care.[2] Accordingly, I would hold that the trial court did not clearly err in finding statutory grounds to terminate respondent's parental rights.

## III. BEST INTERESTS

Because the majority vacates the trial court's findings on statutory grounds, it does not substantively address the trial court's best-interests determination, noting only that MG is safely

---

[2] The facts here stand in contrast to those in *In re Curl*, unpublished per curiam opinion of the Court of Appeals, issued October 29, 2024 (Docket No. 369148). In *Curl*, the respondent likewise struggled with substance abuse and unsuccessfully attempted treatment on multiple occasions during the proceedings but was several months sober at the time of the termination trial. This Court reversed termination under MCL 712A.19b(3)(j), reasoning that "while there may be record evidence to support a reasonable likelihood of relapse, there is no record evidence supporting a reasonable likelihood that the children will be harmed." *Id.* at pp 2-7 (footnote omitted). In support of that holding, the Court noted that "during [the respondent's] times of relapse, there was no evidence of harm to the children." *Id.* at p 8. Here, by contrast, both of respondent's children were born opiate-positive and required treatment for withdrawal, and her subsequent relapse led to MG's near-fatal fentanyl overdose. This record therefore supports the trial court's conclusion that MG faced a reasonable likelihood of harm if returned to her care.

placed with his father and shares a close bond with respondent. In my view, the trial court's analysis of best interests was thorough and supported by the record.

The trial court expressly acknowledged both respondent's bond with MG and his placement with his father. It found that "mother is bonded to the child, loves the child, [and] participated in the rearing of the child to the extent that she could," and it recognized that MG was "thriving and doing well with his father," a relative placement that "works to the benefit of [respondent]." But the court also considered other critical factors. It noted that respondent's testimony reflected limited insight into the consequences of her addiction. It emphasized that MG nearly died from an overdose while in her care and that she failed to timely reveal that he may have ingested drugs at the time of the incident. It further observed that her addiction and sobriety had been cyclical and that she was still in the very early stages of sobriety at the time of trial.

Taken together, those findings demonstrate that the trial court carefully weighed both the positive considerations—respondent's bond and MG's placement with his father—and the serious risk stemming from respondent's history and testimony. On this record, I would hold that the trial court did not clearly err in concluding that termination was in MG's best interests.


/s/ Matthew S. Ackerman